MANATT, PHELPS & PHILLIPS, LLP
ROBERT A. JACOBS (SBN 160350)
rjacobs@manatt.com
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone:  310.312.4000
Facsimile:   310.312.4224

PRANA A. TOPPER (*pro hac vice* forthcoming)
ptopper@manatt.com
7 Times Square, 23rd Floor
New York, New York 10036
Telephone:  212.790.4500
Facsimile:   212.790.4545

*Attorneys for Plaintiffs*
Clifford Harris, Jr. p/k/a T.I. and
Grand Hustle LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CLIFFORD JOSEPH HARRIS, JR. p/k/a T.I. and GRAND HUSTLE LLC, <br><br> Plaintiffs, <br><br> v. <br><br> CINQ RECORDINGS LLC f/k/a CINQ RECORDS LLC; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. <br><br> Judge:  Hon. <br><br> **COMPLAINT FOR BREACH OF CONTRACT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint Filed:  April 27, 2026 |

Plaintiffs Clifford Harris, Jr. p/k/a T.I. ("T.I.") and Grand Hustle LLC ("GH" and, collectively with T.I., "Plaintiffs"), by their attorneys, Manatt, Phelps & Phillips, LLP, allege the following in support of their claims and causes of action against Cinq Recordings LLC f/k/a Cinq Records LLC ("Cinq") and Does 1-10, inclusive (all of the foregoing defendants, collectively, "Defendants").

**NATURE OF THE ACTION**

1.      Eager to boost its profile in the music industry, Cinq acquired from Atlantic Recording Corporation a/k/a Atlantic Records ("Atlantic") in 2017 the sound recordings and audiovisual works comprising Plaintiffs' iconic Atlantic catalog, including the worldwide copyrights and all other right, title, and interest in all such works (collectively, the "Atlantic Catalog"). Cinq sought and obtained Plaintiffs' consent for the acquisition in a 2017 Side Letter Agreement (the "Cinq Agreement"). To secure Plaintiffs' consent, Cinq, among other things, gave Plaintiffs an option to buy the Atlantic Catalog from Cinq (the "Option") at a later date based on a pre-determined purchase price formula that was very favorable to Plaintiffs. Cinq regretted that it had agreed to the formula, and, therefore, when Plaintiffs timely exercised the Option in September 2024, Cinq did everything it could to frustrate Plaintiffs' efforts to complete the purchase in accordance with the Cinq Agreement.

2.      The Cinq Agreement required Cinq to provide GH with "the purchase price [for the Atlantic Catalog] in writing based on the [purchase price formula]" upon receiving the Option exercise. However, Cinq made no attempt to comply with this obligation for six months – i.e., until March 2025. Even then, Cinq disregarded the formula.

3.      The formula required Cinq to add up a defined subset of revenues it derived from the Atlantic Catalog over a specified one-year period, deduct from that sum the compensation to which Plaintiffs were entitled during the same time period, and multiply the difference by 12. Knowing the formula would yield a low

purchase price because of the limited revenue streams it included, Cinq sought to artificially inflate the formula's results. Cinq did so by including significant revenue streams that the formula *expressly excludes*, and by greatly understating the compensation to which Plaintiffs were entitled. Using these tactics Cinq sought to extract a purchase price from Plaintiffs that was *nearly 20 times higher than the price mandated by the parties' agreed-upon formula* – demanding approximately $52 million, instead of the $2.4 million to $3 million due under the formula in the Cinq Agreement.[1] Cinq pursued this strategy despite the fact that it drafted the Cinq Agreement, and devised the formula it refused to apply.

4. Cinq has no conceivable justification for its wrongdoing, and, therefore, has breached its contractual obligations to Plaintiffs, entitling them to specific performance, damages, attorney's fees, and other relief.

## THE PARTIES

5. T.I. is a well-known recording artist, songwriter, actor, and entertainment industry executive, whose work has garnered extraordinary critical and popular acclaim and recognition, including multiple Grammy and other awards. T.I. is a resident of the State of Georgia.

6. GH is a limited liability company organized under the laws of the State of Georgia through which T.I. provides his recording services. T.I. is the sole owner of the membership interests in GH.

7. Upon information and belief, Cinq is a limited liability company organized under the laws of the State of California, and headquartered at 578 Washington Blvd., Suite 175, Marina Del Rey, California 90292. Upon information and belief, Jason Kimball Peterson and John "Barry" Daffurn are the sole owners of

[1] If, hypothetically, Cinq's defined subset of revenues during the relevant time period were $100, and Plaintiffs were entitled to $50 during the same period, then the purchase price under the contractual formula would be $600 (($100 – 50) x 12 = 600). What Cinq did, however, was tantamount to arbitrarily increasing the revenue in the hypothetical from $100 to $1,020 and reducing Plaintiffs' compensation from $50 to $20 in order to boost the purchase price from $600 to $12,000 (($1020 – 20) x 12 = 12,000).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

the membership interests in Cinq, and residents of the State of California.

8.     Plaintiffs do not know the name(s) and/or role(s) in the wrongdoing at issue of the Defendants identified as Does 1 through 10, and, therefore, sue them using such designations. Plaintiffs will seek to amend this Complaint to identify these Defendants when Plaintiffs learn of their name(s) and role(s) in the wrongdoing at issue.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

10.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and/or 1400 because Cinq resides or may be found in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

11.     Cinq is subject to personal jurisdiction in the State of California because it is domiciled in the State; because the claims herein relate to or arise out of activities that it purposefully directed toward or conducted in the State; and because the exercise of personal jurisdiction over it is just and reasonable.

12.     Venue and personal jurisdiction are also proper in this District and State, respectively, based on the forum selection clause in the Cinq Agreement, which provides as follows:

> All claims, disputes or disagreements which may arise out of the interpretation, performance or breach of this Agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of California in Los Angeles [C]ounty or the United States District Court for the [C]entral [D]istrict of California.

(Cinq Agreement ¶ 12.)

## FACTUAL BACKGROUND

### The Contractual Relationship Between the Parties

13.    Plaintiffs entered into an agreement with Atlantic dated as of March 4, 2003, pursuant to which Plaintiffs agreed to provide T.I.'s exclusive recording services to Atlantic. Plaintiffs and Atlantic amended their agreement as of August 7, 2006 (the "2006 Amendment") and on two other occasions (the agreement and all amendments, collectively, the "Atlantic Agreement").

14.    Upon Cinq's acquisition of the Atlantic Catalog in 2017, Atlantic assigned to Cinq, and Cinq assumed, all of Atlantic's rights and obligations to Plaintiffs under the Atlantic Agreement. (*See* Cinq Agreement at 1.)

15.    In addition to confirming Cinq's assumption of Atlantic's rights and obligations under the Atlantic Agreement, the Cinq Agreement amends certain provisions of the Atlantic Agreement. Except as amended, the Cinq Agreement expressly ratifies and confirms the Atlantic Agreement, and acknowledges that the Atlantic Agreement "shall remain in full force and effect". (*Id.* ¶ 14.)

16.    The Cinq Agreement and the Atlantic Agreement "constitute the entire agreement between [Cinq and Plaintiffs]." (*Id.* ¶ 10.)

### The Atlantic Agreement

17.    Plaintiffs delivered seven albums to Atlantic under the Atlantic Agreement, the titles and U.S. release years of which are: *Trap Muzik* (2003) ("LP1"); *Urban Legend* (2004) ("LP2"); *King* (2006) ("LP3"); *T.I. vs. T.I.P.* (2007) ("LP4"); *Paper Trail* (2008); *No Mercy* (2010); and *Trouble Man: Heavy Is the Head* (2012).

18.    The Atlantic Agreement required Atlantic to credit royalties to Plaintiffs' royalty account based on Atlantic's exploitation of the sound recordings and audiovisual works that Plaintiffs delivered to Atlantic by "applying the applicable royalty rate specified [in the Atlantic Agreement] to the applicable Royalty Base Price in respect of Net Sales of the Record concerned" ("Royalty Rate

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

5

COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

Compensation"). (Atlantic Agreement ¶ 9.)

19.    Notwithstanding the Royalty Rate Compensation, if any of the albums delivered under the Atlantic Agreement sold more than 1,500,000 units within 24 months of its initial U.S. commercial release (the "Net Profits Benchmark"), then, with respect to all sound recordings and audio visual works delivered to Atlantic after the date on which such benchmark was surpassed (the "Conversion Date"), Plaintiffs would be entitled to a larger portion of the revenues that such sound recordings and audio visual works generate. Specifically, in such event, the Atlantic Agreement required Atlantic to "accrue to [Plaintiffs'] royalty account . . . *a royalty equal to 50% of the Net Profits . . . in lieu of the [Royalty Rate Compensation provided for] in paragraph 9*" ("Net Profit Royalty Compensation").[2] (*Id.* ¶ 9A(a) (emphasis added.)

20.    LP3 (*King*) exceeded the Net Profits Benchmark. Thus, in entering into the 2006 Amendment, Atlantic expressly "acknowledge[d] that paragraph 9A shall apply to [LP4 (*T.I. vs. T.I.P*)], all other Committed Albums subsequent to [LP4], and any Records solely derived therefrom." (*See* 2006 Amendment ¶ 4.)

21.    In addition to the enhanced compensation applicable to sound recordings and audio visual works delivered after Conversion Date, the Atlantic Agreement entitled Plaintiffs to Net Profit Royalty Compensation instead of Royalty Rate Compensation on all sound recordings and audio visual works delivered to Atlantic *prior to* the Conversion Date (collectively, the "LP1 to LP3 Records") at such time, if any, as Plaintiffs' Royalty Rate Compensation account becomes recouped after the Conversion Date. (*See* Atlantic Agreement ¶ 9A(d).) The Cinq Agreement expressly acknowledges that Plaintiffs' Royalty Rate Compensation account was "recouped" as of April 2017 – clearly in reference to paragraph 9A(d) of the Atlantic Agreement. (*See* Cinq Agreement ¶ 1.) Therefore,

---

[2] Under the Atlantic Agreement, "'Net Profits' means Net Proceeds less Deductions", as such terms are defined therein. (*Id.* ¶ 9A(b)(i).)

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

6

COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

under the Atlantic Agreement, Plaintiffs have been entitled to Net Profit Royalty Compensation *on the entire Atlantic Catalog* from at least April 2017 forward.

22. Separate and apart from its financial terms, the Atlantic Agreement underscores the unique value of the sound recordings comprising the Atlantic Catalog and the rights, including the worldwide copyrights, they embody, in setting forth Atlantic's entitlement to injunctive and other equitable relief:

> You expressly acknowledge that Artist's services hereunder are of a *special, unique and intellectual character which gives them peculiar value*, and that in the event of a breach or threatened breach by you or Artist of any term, condition or covenant hereof, *Company will be caused immediate irreparable injury*. You expressly agree that *Company shall be entitled to injunctive and other equitable relief*, as permitted by law, to prevent a breach or threatened breach of this agreement, or any portion thereof, by you or Artist which relief shall be in addition to any other rights or remedies, for damages or otherwise, available to Company.

(Atlantic Agreement ¶ 14 (emphasis added).)

### The Cinq Agreement

23. In entering into the Cinq Agreement in 2017, Cinq granted the Option discussed in paragraph 1 above based on the following terms:

> Grand Hustle shall have the option to purchase the [Atlantic Catalog] on a "quit claim" basis and at a purchase price which shall be calculated at a value equal to a twelve (12) multiple of the Net Profits ("NP") of the Catalog during the one-year period commencing on May 1, 2023 and ending on April 30, 2024 (the "NP Purchase Formula"). The term "NP" shall be defined as Gross Receipts on an accrual basis minus Artist and Grand Hustle's royalty participation. For the purpose of illustration and for the avoidance of doubt, by way of example: if Gross Receipts during the period is [sic] $2,000,000 and royalties are $850,000, the NP will be $1,150,000 and, [sic] the purchase price would then be $13,800,000.

(Cinq Agreement ¶ 3.)

24. The Cinq Agreement required GH to exercise the Option between May 1, 2024 and April 30, 2026 (the "Option Period"). (*See id*.)

Manatt, Phelps & Phillips, LLP
Attorneys at Law
Los Angeles

COMPLAINT FOR BREACH OF CONTRACT & DEMAND FOR JURY TRIAL

25. The Cinq Agreement prescribes the following procedure for GH to exercise the Option and for Cinq to furnish the purchase price:

> Exercise of [the Option] by [GH] shall be by tendering, during the Option Period, Notice pursuant to the Notice provisions [in paragraph 9 below] of [GH's] intent to purchase the [Atlantic Catalog,] ***at which point Cinq shall provide Grand Hustle with the purchase price in writing based on the NP Purchase Formula*** and [GH] shall have until the end of the Option Period to execute a mutually satisfactory purchase-sale agreement and pay to Cinq the purchase price.

(*Id.* (emphasis added).)

26. GH timely exercised the Option on September 30, 2024 in accordance with the Cinq Agreement's notice provisions (the "2024 Option Exercise").

27. Because the Cinq Agreement does not define the term "Gross Receipts" used in the NP Purchase Formula, the Cinq Agreement incorporates by reference the Atlantic Agreement's definition of this term. *See id.* at 1 ("Unless otherwise noted, capitalized terms used but not otherwise defined have the meaning set forth in the [Atlantic Agreement.]")

28. The Atlantic Agreement defines "Gross Receipts", in relevant part, as "all royalties and flat fee payments ***actually earned and received by company . . . in the United States and specifically attributed to the applicable exploitation of the Recordings and/or Videos concerned***." (Atlantic Agreement ¶ 24(aa) (emphasis added).)

29. The Gross Receipts definition excludes at least two significant revenue streams from the NP Purchase Formula.

30. *First*, the Gross Receipts definition bars any license fees that Cinq receives from Spotify, Apple Music, YouTube and other digital service providers ("DSPs") because such fees (the "DSP License Fees") are ***not*** "specifically attributed" to exploitations of the Atlantic Catalog, but rather are for exploitations of the ***entire repertoire*** of musical works under Cinq's control.

31. Because it was common knowledge when the parties entered into the

Cinq Agreement in 2017 that audio streaming and video streaming via the DSPs had become the main driver of music industry growth and revenues, Cinq had ample reason to know then that the DSP License Fees exclusion would have a significant impact on the NP Purchase Formula when and if Plaintiffs exercised the Option.

32.    *Second*, the Gross Receipts definition prohibits consideration of any revenues from exploitations of the Atlantic Catalog **outside** the United States (the "Foreign Revenues").

33.    That Cinq chose not to modify the Gross Receipts definition – even though it could have because it drafted the Cinq Agreement – forecloses any good faith argument that Cinq did not intend to be bound by the exclusion of DSP License Fees and Foreign Revenues from Gross Receipts or that Cinq should not be otherwise bound by the Gross Receipts definition.[3]

34.    The "royalty participation" that Cinq must deduct from Gross Receipts under the NP Purchase Formula includes all amounts that Cinq accrued – or should have accrued – for Plaintiffs as Royalty Rate Compensation and/or Net Profit Royalty Compensation in accordance with the Atlantic Agreement, or as other contractually-required royalty compensation (the "Other Royalty Compensation"), during the formula's May 1, 2023 through April 30, 2024 measuring period (the "Measuring Period").

35.    Such Other Royalty Compensation includes, without limitation, 50 percent of the label share of SoundExchange royalties paid or credited to Cinq for exploitations of the Atlantic Catalog during the Measuring Period (the "SX Royalties"), which royalties Cinq undertook to pay Plaintiffs in the Cinq Agreement. (*See* Cinq Agreement ¶ 4.)

---

[3] Not only did Cinq choose to forego making any such modification, it also affirmatively "ratified and confirmed" the Gross Receipts definition and its resulting exclusions. (*See* Cinq Agreement ¶ 14.)

**Cinq's Serial Failures To Adhere To Its Option-Related Obligations**

36.    As noted in paragraphs 25 and 26 above, GH timely exercised the Option on September 30, 2024 in accordance with the Cinq Agreement's notice provisions, "at which point Cinq [was to] provide [GH] with the purchase price in writing based on the NP Purchase Formula and [GH would] have until the end of the Option Period to execute a mutually satisfactory purchase-sale agreement and pay Cinq the purchase price." (*Id.* ¶ 3).

37.    Cinq did not comply with its obligation under the Cinq Agreement to provide the purchase price in writing to GH based on the NP Purchase Formula.

38.    Instead of providing the purchase price in writing shortly after September 2024, as the Cinq Agreement required, Cinq made no attempt to fulfill its obligation until it sent Plaintiffs a purported purchase price calculation on March 25, 2025 (the "March 2025 Calculation").[4]

39.    Cinq dragged its feet for six months, notwithstanding the fact that it knew at the time it entered into the Cinq Agreement in April 2017 that it likely would need to go through this process not long after the May 1, 2024 start of the Option Period.

40.    Even worse, the March 2025 Calculation makes clear that Cinq utterly – and purposefully – failed to comply with the NP Purchase Formula.

41.    Cinq departed from the NP Purchase Formula in order to significantly inflate the price it presented to Plaintiffs, expecting that doing so would trigger a negotiation that would yield a better outcome than Cinq otherwise would be able to obtain had it abided by the parties' agreement from the outset.[5]

---

[4] But for a February 21, 2025 demand letter that Plaintiffs' litigation counsel sent Cinq concerning its ongoing failure to provide the purchase price for the Atlantic Catalog and other issues, Cinq would have continued to stonewall Plaintiffs.

[5] In an attempt to shield from disclosure the very information that it ***unconditionally*** agreed to provide Plaintiffs, Cinq included a header on the March 2025 Calculation stating "Per F.R.E. 408 and state equivalents." Cinq's unilateral efforts to limit Plaintiffs' use of this information in this manner not only underscores Cinq's failure to comply with its contractual obligations, but also its awareness of its wrongdoing

42.     Instead of basing its Gross Receipts calculation on the limited revenue streams comprising Gross Receipts, as the Cinq Agreement *expressly requires*, Cinq used a made-up version of "gross revenues". Cinq included DSP License Fees and Foreign Revenues that Cinq received during the Measuring Period, among other streams, in its revenue-side calculation, even though, as discussed in paragraphs 27 through 32 above, the Gross Receipts definition expressly *excludes* such amounts.

43.     Cinq's departure from the contractual definition of Gross Receipts resulted in an exaggerated and inaccurate revenue-side starting point from which Cinq deducted Plaintiffs' royalty participation, which Cinq also miscalculated.

44.     To drive up the purchase price even further, Cinq significantly undervalued the amount of Plaintiffs' royalty participation during the Measuring Period. Contrary to the NP Purchase Formula's requirements, Cinq excluded from the royalty participation *the majority of compensation* that Plaintiffs received or should have received during the Measuring Period. Such excluded amounts included, among other things, *the entirety* of the Net Profit Royalty Compensation,[6] SX Royalties, and Other Royalty Compensation paid or due to Plaintiffs during the Measuring Period.[7] These additional contractual departures allowed Cinq to reduce

---

and the lengths to which it was willing to go to forestall Plaintiffs' acquisition of the Atlantic Catalog.

[6] Cinq apparently omitted Net Profit Royalty Compensation based on a self-serving interpretation that such amounts do not qualify as "royalty participation" under the Cinq Agreement, ignoring that, as set forth in paragraph 19 above, the Atlantic Agreement *expressly* categorizes them as "royalties". (*See* Atlantic Agreement ¶ 9A(a).)

[7] Cinq's accountings and payments to Plaintiffs have been woefully inadequate, depriving Plaintiffs of information about and Net Profit Royalty Compensation for multiple revenue streams to which they are contractually entitled. Among other things, Cinq has not accounted for or paid such compensation for YouTube, synchronization licenses, and other royalty streams, as required by the contractual provisions discussed in paragraphs 19 and 21 and footnote 2 above. Cinq also has not accounted for or paid *any* Net Profit Royalty Compensation for the LP1 to LP3 Records, despite the fact that, as set forth in paragraph 21 above, Cinq acknowledged upon entering into the Cinq Agreement in 2017 that Plaintiffs'

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

11

COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

Plaintiffs' royalty participation far below the amount to which the Atlantic Agreement and Cinq Agreement entitled them.[8]

45.    By minimizing Plaintiffs' royalty participation in this fashion, Cinq was able to artificially maximize the NP to which it applied the 12 multiple under the NP Purchase Formula, and come up with the significantly overstated purchase price of approximately $52 million that it presented to Plaintiffs.

46.    Upon information and belief, including based on accountings for the Measuring Period that Plaintiffs received from Cinq and SoundExchange, (i) Cinq did not earn and receive in the United States during the Measuring Period any flat fee payments that were "specifically attributed" to exploitations of the Atlantic Catalog, in whole or in part; (ii) the SX Royalties that Cinq earned and received in the United States during the Measuring Period amount to at least $400,000, half of which Cinq was obligated, but failed, to remit to Plaintiffs; and (iii) Cinq earned and received in the United States during the Measuring Period only a nominal amount of royalties from digital downloads and physical exploitations specifically attributed to the Atlantic Catalog.

47.    Based on the foregoing, and upon information and belief, after deducting Plaintiffs' royalty participation during the Measuring Period from Cinq's Gross Receipts during the Measuring Period, the NP is approximately $200,000 to $250,000, which, under the NP Purchase Formula, yields a purchase price in the range of $2.4 million to $3 million.

48.    Cinq, thus, manipulated the Gross Receipts and royalty participation provisions in the Cinq Agreement to suit its own ends, and deny Plaintiffs the

account for these records was recouped, thereby entitling Plaintiffs to such compensation for them under paragraph 9A(d) of the Atlantic Agreement.

[8] Even if Cinq had included Net Profit Royalty Compensation in its NP calculations (and it did not), the calculations still would have violated Cinq contractual obligations because, as detailed in footnote 7 above, Cinq improperly omitted several revenue streams included in such compensation, and, thus, greatly understated it.

benefit of the Option, which was one of the principal reasons they agreed to consent to the sale of the Atlantic Catalog to Cinq and enter into the Cinq Agreement in the first place.

**The Cinq Agreement Makes the Atlantic Agreement Subject to California Law**

49.     In entering into the Cinq Agreement, Cinq chose to have California law govern the Atlantic Agreement.

50.     Specifically, Cinq deleted the New York choice of law clause in paragraph 31(b) of the Atlantic Agreement, and replaced it with a California choice of law clause, as follows:

> Governing Law . . . . Section 3l(b) of the [Atlantic Agreement] shall be, as of the Effective Date, deleted in its entirety and shall be replaced with the following: This Agreement has been entered into in the State of California, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California (without regard to the conflicts of law principles of such State).

(Cinq Agreement ¶ 12.)

51.     In doing so, Cinq brought the Atlantic Agreement within the purview of all applicable laws of the State of California, including, without limitation, the reciprocal fee-shifting provisions in Cal. Civ. Code § 1717 (a).

52.     The Atlantic Agreement triggers the application of this statute to this lawsuit as a result of the indemnification obligations that the Atlantic Agreement imposes on Plaintiffs:

> You agree to and do hereby indemnify, save and hold Company and its Principal Licensees harmless from any and all loss, damage, liability and other expense (***including anticipated and actual court costs, expenses and reasonable outside attorneys' fees***) arising out of, connected with or as a result of any inconsistency with, failure of, or breach or threatened breach by you or Artist of any warranty, representation, agreement, undertaking or covenant contained in this agreement including, without limitation, any claim by any third party in connection with the foregoing, provided that such

claim has been settled with your consent or reduced to judgment.

(Atlantic Agreement ¶ 15(b) (emphasis added).) By their terms, these obligations, including those requiring Plaintiffs to pay Cinq's "court costs, expenses and reasonable outside attorneys' fees", apply not just to third party claims against Cinq arising from alleged wrongdoing by Plaintiffs, but also to breach of contract claims that Cinq may have against Plaintiffs *unrelated to any such third-party claims*.

53.    Because the Cinq Agreement replaces the New York choice of law clause in the Atlantic Agreement with a California choice of law clause (and that also applies to the Cinq Agreement), the cost-, expense-, and fee shifting provisions in paragraph 15(b) of the Atlantic Agreement quoted in the preceding paragraph entitle Plaintiffs to recover from Cinq the costs, expenses and reasonable outside attorneys' fees that Plaintiffs incur in connection with this lawsuit. *See* Cal. Civ. Code § 1717 (a).

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

54.    Plaintiffs refer to and reallege each and every allegation in paragraphs 1 through 53 above as if fully set forth herein.

55.    Upon acquiring the Atlantic Catalog from Atlantic, Cinq assumed Atlantic's rights and obligations under, and became Plaintiffs' counter-party to, the Atlantic Agreement.

56.    Plaintiffs and Cinq are also parties to the Cinq Agreement.

57.    The Atlantic Agreement and the Cinq Agreement are valid and enforceable contracts.

58.    Plaintiffs have fully performed their obligations under the Atlantic Agreement and the Cinq Agreement, or such performance has been excused, including, without limitation, as a result of Cinq's prevention and/or frustration of Plaintiffs' performance.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

14

COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

59.     Cinq has breached its obligations under the Cinq Agreement and Atlantic Agreement by, among other things, failing to provide to Plaintiffs within a reasonable time after the 2024 Option Exercise a written computation of the purchase price for the Atlantic Catalog in accordance with the NP Purchase Formula, including, without limitation, (i) the Gross Receipts definition in the Atlantic Agreement that the Cinq Agreement incorporates by reference; and (ii) the royalty participation to which Plaintiffs are entitled under the Atlantic Agreement and the Cinq Agreement.

60.     As a direct and proximate result of Cinq's breach of the Cinq Agreement and Atlantic Agreement as set forth above, Plaintiffs have sustained damages, including, without limitation, (i) being denied the right to acquire the sound recordings and audiovisual works comprising, and all rights, including the worldwide copyrights, in, the Atlantic Catalog for a $2.4 million to $3 million purchase price, as the NP Purchase Formula provides, instead of the approximately $52 million purchase price demanded by Cinq (the "Principal Harm"); and (ii) the delayed enjoyment of the rights and benefits attendant to ownership of the Atlantic Catalog starting at a reasonable time after the Option Exercise, such as, among other things, the receipt of the various revenue streams that the catalog generates, the annual value of which is in excess of $1 million (the "Delay Damages").

61.     With respect to the Principal Harm, and without waiving their right to seek money damages in the alternative, Plaintiffs seek specific performance of Cinq's obligations under paragraph 3 of the Cinq Agreement to (i) calculate the purchase price for the Atlantic Catalog in strict accordance with the NP Purchase Formula; (ii) provide such purchase price to Plaintiffs in writing; (iii) enter into a mutually-satisfactory agreement for the sale to Plaintiffs of the sound recordings and audiovisual works comprising, and the worldwide copyrights and all other rights in, the Atlantic Catalog based on the purchase price; and (iv) convey such sound recordings, audiovisual works, and rights to Plaintiffs upon entering into

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

15                    COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

such agreement, and receiving the purchase price from Plaintiffs.

62.     Plaintiffs are entitled to specific performance to remedy the Principal Harm because (i) the terms of the Cinq Agreement, including the specific terms in paragraph 3 for which Plaintiffs seek specific performance, are sufficiently definite; (ii) Plaintiffs provided adequate consideration for Cinq's undertakings in the Cinq Agreement, including, without limitation, by providing their consent to Cinq's acquisition of the Atlantic Catalog; (iii) the specific performance sought is substantially similar, if not identical, to the terms of the Cinq Agreement, as the remedy seeks Cinq's compliance with the terms of paragraph 3 thereof; (iv) Cinq already has received the benefits of Plaintiffs' full performance under the Cinq Agreement and the Atlantic Agreement, and, in any event, the remedies available to the parties are mutual; and (v) the special and unique character of the sound recordings comprising, and of the worldwide copyrights and other rights in, the Atlantic Catalog, including as set forth in paragraph 22 above, as well as the intangible legacy value of the Atlantic Catalog for Plaintiffs, confirm that money damages cannot fully compensate them for the Principal Harm, and, therefore, that they do not have an adequate remedy at law.

63.     Plaintiffs also seek at least $1.5 million from Cinq for the Delay Damages that Plaintiffs have sustained to date, and an additional amount for the Delay Damages that Plaintiffs incur hereafter through the date on which the parties consummate the sale of the Atlantic Catalog to Plaintiffs.

## **PRAYER**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.     On the First Claim for Relief for breach of contract, that Cinq be required to specifically perform its obligations under paragraph 3 of the Cinq Agreement to (i) calculate the purchase price for the Atlantic Catalog in strict accordance with the NP Purchase Formula; (ii) provide such purchase price to

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

16

COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL

Plaintiffs in writing; (iii) enter into a mutually-satisfactory agreement for the sale to Plaintiffs of the sound recordings and audiovisual works comprising, and the worldwide copyrights and all other rights in, the Atlantic Catalog based on the purchase price; and (iv) convey such sound recordings, audiovisual works, and rights to Plaintiffs after entering into such agreement, and receiving the purchase price from Plaintiffs.

2.     On the First Claim for Relief for breach of contract, that Cinq be required to pay Delay Damages to Plaintiffs in an amount equal to all revenues received by or credited to Cinq for any and all exploitations of the Atlantic Catalog, in whole or in part, from and after a reasonable time following the Option Exercise through and including the date of judgment, which amount Plaintiffs believe is no less than $1.5 million currently and will continue to increase hereafter.

3.     For an amount equal to Plaintiffs' court costs, expenses and reasonable outside attorneys' fees in accordance with paragraph 12 of the Cinq Agreement, paragraph 15(b) of the Atlantic Agreement, and Cal. Civ. Code § 1717 (a).

4.     For pre-judgment and post-judgment interest on all sums awarded;

5.     For costs allowed by the Federal Rules of Civil Procedures and the Local Rules of this Court; and

6.     For such other and further relief as the Court deems just and proper.

Dated: April 27, 2026          MANATT, PHELPS & PHILLIPS, LLP


By: */s/ Robert A. Jacobs*
    Robert A. Jacobs
    Prana A. Topper

    *Attorney for Plaintiffs*
    Clifford Harris, Jr. p/k/a T.I. and Grand Hustle LLC

## **DEMAND FOR JURY TRIAL**

Plaintiffs Clifford Harris, Jr. p/k/a T.I. and Grand Hustle LLC respectfully demand a trial by jury.

Dated: April 27, 2026          MANATT, PHELPS & PHILLIPS, LLP


By: */s/ Robert A. Jacobs*
　　Robert A. Jacobs
　　Prana A. Topper

　　*Attorney for Plaintiffs*
　　Clifford Harris, Jr. p/k/a T.I. and Grand Hustle
　　LLC

Manatt, Phelps &
Phillips, LLP
Attorneys at Law
Los Angeles

18          COMPLAINT FOR BREACH OF CONTRACT
& DEMAND FOR JURY TRIAL